**OUTTEN & GOLDEN LLP**
Darnley D. Stewart
Gregory S. Chiarello
685 Third Avenue, 25th Floor
New York, New York 10017
(212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGELA SHIRLAW,<br><br>               Plaintiff,<br><br>   v.<br><br>NEW YORK STATE UNIFIED COURT<br>SYSTEM OFFICE OF COURT<br>ADMINISTRATION, and DENNIS W. QUIRK,<br><br>            Defendants. | **COMPLAINT**<br><br>**Demand for Trial by Jury** |

Plaintiff Lieutenant Angela Shirlaw ("Lt. Shirlaw" or "Plaintiff") complains of Defendants the New York State Unified Court System Office of Court Administration ("OCA") and Dennis W. Quirk ("Officer Quirk") (collectively, "Defendants"), as follows:

### NATURE OF THE ACTION

1.      Lieutenant Angela Shirlaw is a dedicated Court Officer and one of a small group of women to ever achieve the rank of Lieutenant in New York City's Criminal Court system. She has served every post with integrity, putting first the safety of civilians, court personnel and Court Officers.

2.      Manhattan Criminal Court, her post for the majority of her 19-year career, is an environment dominated by men in all respects. It is an environment openly hostile to women, where male Court Officers respond negatively to orders from female commanding officers, OCA

employees openly refer to female judges as "cunts," and Lt. Shirlaw is labeled a "bossy bitch" because she does her job well. It is also an environment where male OCA employees influence promotion decisions, excluding women and favoring less-qualified men for open roles. OCA's discriminatory practices have cost Lt. Shirlaw numerous deserved advancement opportunities because of her gender and sexual orientation.

3.      Accordingly, Lt. Shirlaw brings this action to remedy discrimination and retaliation on the basis of sex and sexual orientation, by Defendant OCA, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000C, *et seq.*, and by Officer Quirk, in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

4.      This case arises, in part, under Title VII, a federal statute. Accordingly, this Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1331.

5.      Lt. Shirlaw filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on December 13, 2016, amending her charge with additional allegations of retaliation on March 17, 2017. On or around April 20, 2017, the EEOC issued Lt. Shirlaw a Notice of Right to Sue, which she received on April 26, 2017. Thus, Lt. Shirlaw has complied with the procedural requirements of Title VII.

6.      Lt. Shirlaw's claims under NYCHRL arise out of the same incidents as the federal claims that are properly before this Court. Therefore, pursuant to 28 U.S.C. § 1367 the Court may properly exercise supplemental jurisdiction over the NYCHRL claims.

7.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions in this action occurred within the Southern District of New York.

## PARTIES

**Plaintiff Angela Shirlaw**

8.     Lt. Shirlaw is a gay woman employed by OCA as a Court Officer since 1998. She attained the rank of Sergeant in 2007 and was promoted to Lieutenant in 2008.

9.     Lt. Shirlaw is a well-regarded Lieutenant who has consistently received positive feedback and evaluations.  During all relevant times, Lt. Shirlaw was qualified for all positions held and applied for with OCA.

10.     During all relevant times, Lt. Shirlaw was an "employee" as defined under Title VII and the NYCHRL.

11.     Lt. Shirlaw currently resides in Nassau County, New York.

**Defendant OCA**

12.     The Unified Court System is the judicial branch for the State of New York.  OCA is the administrative arm of the Unified Court System, and is headed by the Chief Administrative Judge, Lawrence Marks, who reports to the Chief Judge of the State of New York, Janet DiFiore. OCA's main offices are located at 25 Beaver Street, New York, NY 10004.

13.     During all relevant times, OCA was Lt. Shirlaw's "employer" within the meaning of Title VII and maintained more than 15 employees at all times relevant to this action.

**Defendant Officer Dennis W. Quirk**

14.     Officer Quirk is employed by OCA as a Court Officer.

15.     For the past 40 years, Officer Quirk has served as President of the New York State Court Officers' Association ("NYSCOA" or the "union"), the collective bargaining unit for

Court Officers in all of the lower courts of New York. Officer Quirk has been the sole President of NYSCOA since its inception.

16.     During all relevant times, Officer Quirk was an "employee" and a "person" within the meaning of the NYCHRL.

**FACTUAL ALLEGATIONS**

**OCA's Long History of Denying Promotions to Female Court Officers**

17.     Pursuant to N.Y.C.P.L. § 2.10(21), Court Officers are peace officers assigned to maintain the security of New York's courts. They receive extensive law enforcement training and carry firearms. The job presents daily potential safety risks, particularly in Criminal Court.

18.     Court Officers are ranked as follows: Officer, Sergeant, Lieutenant, Captain, Major, Chief. In 2009, OCA began to phase out the Captain position in Criminal Court. Chiefs receive stars to designate rank, with four stars signifying the highest ranking.

19.     OCA employs approximately 4000 Court Officers state-wide, with approximately 1200 in the boroughs of New York City. Within New York City, there are fewer than ten Officers who hold the rank of Chief.

20.     Recruit classes at the Court Officers' Academy typically are comprised of approximately one-third or more women, who graduate the Academy at a rate similar to men.

21.     However, female Court Officers, particularly those assigned to Criminal Court, are dramatically underrepresented in ranked Court Officer positions in New York City. In Criminal Court, only six of approximately 73 Sergeants and only five of approximately 21 Lieutenants in Criminal Court are women, and there are no female Captains, Majors, Chiefs, Assistant Chiefs or Deputy Chiefs, out of approximately 14 such positions. Recently retired Department Chief Jewel Williams is, upon information and belief, the only woman ever to have been awarded a Chief position in New York City Criminal Court.

22.     OCA, and specifically, the Administrative Judge for each court in each borough, is responsible for Court Officer placement and promotions.  Final selections are also sent to the Deputy Chief Administrative Judge for New York City Courts, who accepts the selection and makes the promotion official.

23.     OCA's policy is to post open positions so that any eligible Court Officer may apply.  Applications go to Justin Barry, the Chief Clerk of Criminal Court, who, in conjunction with OCA, selects a hiring panel of 5-6 people that includes Barry, Chief Michael Magliano, the borough Chief Clerk, and two or three Court Officers ranked at or above the available position.  Applications are reviewed by a panel of OCA employees, who select qualified candidates for interviews.  Following interviews, the panel deliberates and makes a recommendation to the Administrative Judge for that court, who approves or disapproves of the promotion selection.

24.     The union, *i.e.* NYSCOA, does not have any official role in the decision-making process for promotions.

25.     In practice, Court Officer promotions for senior level positions are not handled according to OCA policy.  Rather, Officer Quirk determines or helps determine who is promoted to senior level Court Officer positions, and informs both the interview panel and Administrative Judge of his selection before formal decisions are made, sometimes before interviews are even scheduled.  OCA typically adheres to Officer Quirk's selections.  These selections are almost always men.  Thus, Officer Quirk skews what should be an objective, merit-based system to heavily favor male Court Officers.

26.     Officer Quirk's involvement in the promotion process is well known.  Early on in Lt. Shirlaw's career, Officers repeatedly told her that if she wanted to be promoted, she needed to talk to Officer Quirk.

27.     On information and belief, Officer Quirk also influences the reappointment of judges, including Administrative Judges.

**Lt. Shirlaw's Background and Hiring as a Court Officer**

28.     Lt. Shirlaw graduated from St. John's University with a Bachelor of Science in 1987.  For nine years prior to working for OCA, she worked for the United States Postal Service.

29.     In 1998, Lt. Shirlaw applied for, was accepted to, and completed the Court Officer's Academy.  Her first assignment was to Manhattan Criminal Court, located at 100 Centre Street.

30.     Lt. Shirlaw attended the Academy with Major John ("Jack") Allen,[1] who graduated with Lt. Shirlaw.  His first assignment also was at 100 Centre Street; Major Allen and Lt. Shirlaw started on the same day.

31.     Shortly after her hire, Officer Quirk met with Lt. Shirlaw.  During their meeting, Officer Quirk asked Lt. Shirlaw if she was a lesbian.  He told Lt. Shirlaw that Judge Judith Kaye, at the time the Chief Judge of New York, "did not like gay people," and that Lt. Shirlaw should try to get back her old job at the Post Office.

32.     Officer Quirk again told Lt. Shirlaw that Judge Kaye "did not like gay people" on several other occasions after that meeting and, on information and belief, has made similar comments to other gay officers.

33.     It is well recognized that Judge Kaye was a strong advocate for women and gay rights.

---

[1] For consistency of description, Court Officers will be identified by their current (or if retired, last-held) rank, regardless of time-period discussed.

**Discriminatory Denial of Promotions: 2001-2007**

34.      From 1998 to 2008, Lt. Shirlaw worked in Manhattan Criminal Court, located at 100 Centre Street.  After 2000, that command was run by Thomas Garvey, a Captain later promoted to Major. Lt. Shirlaw worked as an officer in several different capacities, including in courtrooms, doing perimeter and lobby security, and in the Central Operations Office.  She always had an excellent working relationship with Major Garvey.

35.      Between 2001 and 2007, Lt. Shirlaw applied for at least six positions of higher rank and pay within the court system.  OCA interviewed her for all of the positions, but awarded her none of them.  OCA awarded all of the positions to men.

36.      On information and belief, Officer Quirk influenced who would receive those positions and specifically selected men for those positions.

37.      On information and belief, Lt. Shirlaw was similarly or more qualified than the male candidates OCA chose to promote.  Lt. Shirlaw had been on the job as long or longer than many of the men who received the promotions, and had a college degree, which many of the Court Officers who were promoted did not have.

38.      In early 2007, Lt. Shirlaw took the Sergeant's Examination and passed with a score of 91 out of 100.  In April 2007, OCA promoted Lt. Shirlaw to Sergeant, a title promotion that comes with passing the Sergeant's exam and interview.  As a Sergeant, she was assigned to a specific courtroom, but because of her previous experience in the Central Operations Office, she frequently was called upon to manage the command when her superior officers were out or unavailable.

**2008 Promotion to Lieutenant**

39.     In 2008, six Lieutenant positions became available.  Lt. Shirlaw applied for all of the open positions, and submitted two or three recommendations from sitting judges she had worked with in support of her application.

40.     Upon information and belief, Lt. Shirlaw was one of the top six candidates for the six Lieutenant positions, and was ultimately awarded one of the positions by Administrative Judge for New York City Criminal Courts, Juanita Bing Newton.

41.     In August 2008, Officer Quirk called Lt. Shirlaw into his office and told her that, by submitting recommendations from judges, she had "fucking ruined everything."  He told her that Judge Newton had seen the recommendations and had decided to award Lt. Shirlaw one of the six Lieutenant positions.

42.     On information and belief, Officer Quirk already had identified six men who he wanted to place in those positions, and Lt. Shirlaw's receipt of a Lieutenant position would have disrupted his plan by displacing one of the six men.

43.     At the time, Officer Quirk told Lt. Shirlaw that he had demanded that his original six selections remain undisturbed.  According to Officer Quirk, in response, Judge Newton created an additional Lieutenant line to accommodate his demand, so that his six selections would be promoted.  Officer Quirk further told Lt. Shirlaw that he in turn demanded that *two* additional Lieutenant lines be added, so that Maj. Allen would be promoted to Lieutenant as well.

44.     Of the eight Court Officers OCA promoted to Lieutenant in the Fall of 2008, Lt. Shirlaw was the only woman.

**Retaliation by OCA and Officer Quirk**

45.    Although officers sometimes were transferred to a new command upon receiving a promotion to Lieutenant, most remained at their command because of their history and familiarity with that post.  Three officers from 100 Centre Street were promoted to Lieutenant – Lt. Shirlaw, Maj. Allen, and another man. Maj. Allen and the man remained at 100 Centre Street; OCA, however, transferred Lt. Shirlaw to Midtown Community Court ("MCC").  MCC is an isolated satellite command at 54th Street, located in an old building notorious for having health code violations such as mold, sewage backups, vermin and cockroaches.

46.    On information and belief, Officer Quirk was involved in the decision to move Lt. Shirlaw to MCC and to keep Maj. Allen at 100 Centre Street.  In a meeting at his office, Officer Quirk notified Lt. Shirlaw of her reassignment to MCC.  He also told Lt. Shirlaw that male Court Officers had complained to him that she had received the Lieutenant promotion only because she was a gay woman.

47.    Upon information and belief, Officer Quirk had not received complaints about Lt. Shirlaw receiving the Lieutenant promotion, because of her gender, sexual orientation, or otherwise. Lt. Shirlaw asked Officer Quirk for additional information about the substance and source of the alleged complaints, but Officer Quirk did not provide any additional information.

48.    Officer Quirk also told Lt. Shirlaw that Maj. Garvey, with whom she had worked for many years without issue, had picked Maj. Allen to remain at 100 Centre Street, and that Maj. Garvey, with whom she had worked well for many years, did not "like" her.

49.    Lt. Shirlaw later spoke to Maj. Garvey about her conversation with Officer Quirk. Maj. Garvey told Lt. Shirlaw that he never had any issue with her or her work, and had never expressed any dissatisfaction with her to anyone.  He further explained that he had no choice about taking Maj. Allen because Officer Quirk had ordered it, and that he would have preferred

9

to have kept her at 100 Centre Street because she already had been handling many responsibilities of the Lieutenant position and knew the command. Maj. Garvey had worked closely with Lt. Shirlaw up to that point, but had little experience with Maj. Allen because Maj. Allen had worked night court shifts for many years, or otherwise had a post screening entrants to the courthouse.

50.     Officer Quirk ended the conversation by telling Lt. Shirlaw that she had better "keep [her] mouth shut" and to not talk to any judges. He then spoke in a derogatory manner about the female judges who had provided Lt. Shirlaw with recommendations, each of whom is an African-American woman. Officer Quirk described the judges to Lt. Shirlaw as "three monkeys" and said that they needed to "shut their fucking mouths," too.

**Lieutenant Shirlaw's First Discrimination Complaint
and Retaliation by OCA and Officer Quirk**

51.     After receiving Officer Quirk's threats and being exiled to MCC, Lt. Shirlaw mentioned to the other newly-promoted Lieutenants that she felt he had discriminated against her because she is a gay woman.

52.     A few days later, over the weekend, Officer Quirk called Lt. Shirlaw. Officer Quirk told her that he had heard she had contacted the media about "the situation" around her promotion and transfer. She had not.

53.     Officer Quirk stated that he had received a call from a journalist who wanted to do a story about the "gay girl" who the judge promoted and who had been transferred to another command. Upon information and belief, Officer Quirk was lying; he had not received any media inquiry.

54.     Lt. Shirlaw felt threatened by Officer Quirk's accusation and believed it to be a message from him that complaining was useless. As a result of that conversation, her transfer to

MCC, and Officer Quirk's command that she "shut her mouth," Lt. Shirlaw feared that there would be consequences to her career if she ever formally complained.

**Discriminatory Denial of Promotions: 2010-2015**

55.    Between 2010 and 2015, Lt. Shirlaw applied for at least seven Court Officer positions, including Major, Manhattan Civil Court (2010); Major, Queens Criminal Court (2012); and a City-wide Captain position (2014). OCA awarded all of the positions to male Court Officers.

56.    On information and belief, Lt. Shirlaw was similarly or more qualified than the male candidates OCA chose to promote. For example, in 2012, City-wide Chief Walter Glowacz told Lt. Shirlaw that she was the top-ranked candidate for the Queens Criminal Court Major position. However, that position was awarded to Lt. Phil DeBlasi, a man close with Officer Quirk but who had little experience running a command because he had been on "temporary" assignment to the union for most of his career.

57.    Lt. Shirlaw had been told that she was the "number two" candidate for at least four other positions that were awarded to men. For example, in or about 2014, OCA created and posted a City-wide Captain position, for which Lt. Shirlaw applied. However, in or about July 2014, OCA promoted Maj. Allen to this position, even though Lt. Shirlaw had considerably more supervisory experience than Maj. Allen. She had run an independent command at Midtown Community Court and had significant command experience at 100 Centre Street.

58.    As of approximately 2009, OCA had phased out the Captain position in almost every Criminal Court command in New York. On information and belief, Officer Quirk directed OCA to create this position solely for the benefit of Maj. Allen's career, as he had directed OCA to create a Lieutenant position for Maj. Allen in 2008, and for other men on countless other occasions. As such, Lt. Shirlaw, who had applied and interviewed for the position, never was

legitimately considered because OCA, through Officer Quirk's influence, already had decided that Maj. Allen would receive the position. Indeed, since promoting Maj. Allen to Major in early 2016, OCA has not posted or filled the vacant Captain position.

**Lt. Shirlaw was the Most Qualified Candidate for the 2016 Manhattan Major Position**

59.     After suffering approximately three years in exile at MCC, in or about February 2011, Lt. Shirlaw was asked by Chief Glowacz to return to 100 Centre Street to assist Maj. Garvey, with whom she had previously worked (and who, according to Officer Quirk, did not like her). Chief Glowacz told Lt. Shirlaw that Maj. Garvey would be retiring, needed immediate assistance in the Central Operations Office, and that he was "grooming" her to assume Maj. Garvey's role as Major in the command.

60.     In 2013, Chief Glowacz retired and was replaced by Chief Michael Magliano, a close friend of Officer Quirk's.

61.     Between 2011 and 2015, Lt. Shirlaw worked alongside Maj. Garvey on a daily basis and shared the running of the command with him. Lt. Shirlaw handled day-to-day command operations including managing security operations and implementation of security policies, participating in managerial meetings, daily staffing and deployment, scheduling and monitoring time and leave, training assignments, disciplinary action, employee evaluations, handling unanticipated building emergencies and evacuations, and involvement in the promotion process for Sergeants.

62.     Beginning in 2012, Maj. Garvey took leave multiple times, and when not on leave, was frequently absent for various appointments. Lt. Shirlaw ran the command on her own in his absence.

63.     On November 27, 2015, Maj. Garvey retired.  At the time, Lt. Shirlaw assumed full responsibility for the command.

64.     Prior to Maj. Garvey's retirement, OCA posted an opening for a Major position in Staten Island. Although the posting did not specify that the position was in Staten Island, it was widely known that the Staten Island Major, James Masucci, had recently retired, creating a vacancy.  During the application period, Lt. Shirlaw applied for the position.  Maj. Allen did not. Upon information and belief, only three officers submitted applications for the Staten Island position. These three officers were Paul Arcati, Lt. Shirlaw, and another man.

65.     When Maj. Garvey retired, his Major position in Manhattan also became available.  Typically, when additional positions with the same description become available, OCA will not create a new, separate job posting or repost the prior posting.  Instead, OCA choses candidates for all open positions with that description from the applicant pool from the first posting.  Often, postings do not indicate a specific location for that reason.

66.     In December 2015, OCA departed from this practice (on information and belief, at the direction of Officer Quirk) and mandated that the posting for Major be reposted and the application process extended.  Upon information and belief, OCA did so in order to allow Officer Quirk's preferred male candidate, Maj. Allen, to apply for the Manhattan Major position. As a result, OCA put the Staten Island Major hiring process on hold.

67.     At a meeting with Chief Clerk Barry, Lt. Shirlaw learned that OCA had halted the application process for the Staten Island position and would be creating an additional posting that would cover both Staten Island and Manhattan.  The meeting was a convening of Criminal Court Majors for each New York City county.  (As acting Major of Manhattan Criminal Court, Lt. Shirlaw was invited to the meeting.)

68.     At this meeting, Chief Clerk Barry stated that OCA would be departing from regular practice for filling open positions for "reasons he did not want to get into."

69.     Lt. Shirlaw submitted a second application for the Manhattan Major position, thereby expressing her interest in both open Major positions, and interviewed for them on February 17, 2016.

70.     With her application, Lt. Shirlaw included four recommendation letters, three from sitting judges and one from Maj. Garvey. Upon information and belief, no other candidate had similar endorsements, and Maj. Garvey had not endorsed any other candidate, including Maj. Allen.

71.     In addition to her endorsements, Lt. Shirlaw's greater supervisory experience rendered her the most qualified candidate for the Major position.  She had worked under Maj. Garvey since 2011 in a supervisor role in which she performed all of the functions of a Major. Prior to 2011, she had run the command at MCC, and prior to that, she had worked directly with Maj. Garvey for many years when he was the Captain at 100 Centre (an essentially similar role, as there was no Major at 100 Centre Street at the time).  Lt. Shirlaw also has a college degree.

72.     In contrast, Maj. Allen, although a fine Court Officer, had little experience running a command.  While at 100 Centre Street, he worked night court for many years, and then worked the front door security detail.  From 2011 to 2014, he worked with Chief Glowacz outside of 100 Centre Street in a largely administrative role.  Similarly, upon his appointment to City-wide Captain, his role was largely administrative and he had little interaction with the day-to-day running of 100 Centre Street.  Maj. Allen does not have a college degree.

73. Notwithstanding her excellent qualifications and recommendations, and that she had already been performing many of the functions of the Manhattan Major position, Lt. Shirlaw did not receive either open Major position.

74. On March 3, 2016, OCA awarded the Staten Island Major position to Paul Arcati, a man, and the Manhattan Major position to Maj. Allen, a man.

**Lt. Shirlaw is Denied Promotion to Manhattan**
**Major Because of Her Gender and Sexual Orientation**

75. OCA's decision to promote Maj. Allen was a departure from its normal practice. Typically, promotions above the level of Lieutenant are awarded from within the command, because of the officer's familiarity and experience with the command. Upon information and belief, Lt. Shirlaw is the first applicant performing an interim ranked-officer position who was not later awarded that position, even though such positions regularly are awarded to men in similar circumstances.

76. For example, Maj. Arcati was a Lieutenant in Staten Island at the time of his promotion. Like Lt. Shirlaw, he had been acting as Major of the command since the prior Major retired several months before OCA posted the position. OCA awarded him the promotion to Major.

77. Indeed, the promotion process for the Major positions was a sham. Officer Quirk and OCA had determined who would be receiving both Major promotions before the decision committee even met, and directed members of the decision committee to give the promotion to Maj. Allen.

78. During the application window for the Manhattan Major position, and even earlier, many of the officers Lt. Shirlaw supervised told her that they had heard Maj. Allen would be promoted instead of her. In 2008, Lt. Shirlaw similarly had heard rumors that all of the slots

for Lieutenant promotions already had been filled long before any decisions had been announced.

79. The rumors regarding the Manhattan Major position turned out to be true. In late 2015 or early January 2016, shortly after Maj. Garvey retired, Administrative Judge Melissa Jackson, who is responsible for final sign-off on Court Officer promotions,[2] reached out to Officer Quirk to let him know that she supported Lt. Shirlaw's promotion to the Major position.

80. On January 8, 2016 or earlier, and in any event more than a month before interviews for the Major position would take place, Officer Quirk told Judge Jackson that Maj. Allen, and not Lt. Shirlaw, would receive the Major position, because Chief Magliano wanted Maj. Allen to get the position. He explained to Judge Jackson that Maj. Allen's promotion to Major was a necessary stepping-stone for him to later assume a Chief position.

81. Judge Jackson had initially supported Lt. Shirlaw for the position for several reasons. She had worked with Lt. Shirlaw directly and knew of her strong work ethic and capability. Further, a group of officers directly supervised by Lt. Shirlaw independently approached Judge Jackson to urge her to select Lt. Shirlaw for the position based on their strong view of her leadership skills, organization, and other qualifications.

82. Shortly thereafter, also in late 2015 or early January 2016 (and well before interviews), Judge Jackson told Lt. Shirlaw about her conversation with Officer Quirk, and that she would not be promoted to Major.

83. Lt. Shirlaw's domestic partner, Kate Mogulescu, is an attorney who practices at 100 Centre Street. Ms. Mogulescu has known, and practiced in front of, Judge Jackson for many years. In a conversation on or about January 8, 2016, Ms. Mogulescu spoke with Judge Jackson

---

[2] While the Deputy Chief Judge must ultimately approve all promotions, upon information and belief, she uniformly relies on the recommendations of the Administrative Judge.

about the open Major position.  In that conversation, Judge Jackson expressed her favorable view of Lt. Shirlaw.  She indicated that she would love to see Lt. Shirlaw as Major of Manhattan Criminal Court and that she supported her application.

84.     Later that day, Judge Jackson sent Ms. Mogulescu an email reporting that she had reached out to Officer Quirk and learned that the Major position would be going to Maj. Allen. (notwithstanding that not a single candidate had even been interviewed for the position at that time).

85.     In or about February 2017, a hiring committee of five OCA employees conducted interviews for the two open Major positions.  Chief Magliano and Chief Clerk Barry were two of the five committee members. Upon information and belief, Chief Magliano and Chief Clerk Barry influenced the committee deliberation process to ensure that OCA awarded the promotion to Maj. Allen.

86.     Prior to Lt. Shirlaw's interview on February 17, 2016, Chief Clerk Barry similarly told Lt. Shirlaw that Maj. Allen, and not she, would be awarded the Manhattan Major position. He told Lt. Shirlaw that there already were plans in place to further promote Maj. Allen to Chief because of upcoming retirements.

87.     Upon information and belief, during the committee's deliberation process, Chief Magliano acknowledged Maj. Allen's lack of experience running a command.  Rather than accept it as a reason not to promote Maj. Allen, however, he argued his lack of experience was a basis to promote him, which other committee members found dubious.

88.     Upon information and belief, during the committee's deliberation process, Chief Magliano and Chief Clerk Barry influenced the decision process by telling the other members of the hiring committee that judges found Lt. Shirlaw to be "abrasive," which was false.

89.     Chief Magliano also attempted to influence the outcome of the hiring committee by refusing to accept a recommendation proffered on Lt. Shirlaw's behalf.  On or around February 17, 2016, Lieutenant Charlie Hollon, a Lieutenant who worked with Lt. Shirlaw at 100 Centre Street, called Chief Magliano to provide an unsolicited reference and written recommendation on her behalf.  Chief Magliano instructed him that he could not submit a recommendation on Lt. Shirlaw's behalf unless he did so for every candidate, causing Lt. Hollon not to submit a recommendation for anyone.

90.     Chief Magliano had condoned Officer Quirk's discriminatory conduct in the past. For example, in or about mid-March 2014, at a meeting attended by Officer Quirk, Chief Magliano, and Lt. Shirlaw about staffing conditions at 100 Centre Street, Officer Quirk repeatedly called Judge Tamiko Amaker a "fucking cunt," because she had opened another courtroom for processing misdemeanor cases.  Lt. Shirlaw told Officer Quirk that his use of the term "cunt" made her uncomfortable, which prompted him to say it again, several times, to her face. Officer Quirk also called Lt. Shirlaw a "bossy bitch" at that meeting while at the same time chastising her for being "too nice" to attorneys and judges with whom she worked.

91.     Later, Lt. Shirlaw told Chief Magliano that the way Officer Quirk spoke about women made her very uncomfortable.  Chief Magliano told Lt. Shirlaw that he had known Officer Quirk over 30 years and that was "just the way he is." On information and belief, Chief Magliano did not report Lt. Shirlaw's complaint to anyone or take any corrective action.

92.     Lt. Shirlaw observed OCA tolerate bias against women officers, including her, throughout her career.  As a Lieutenant at 100 Centre Street, some male Sergeants and Officers would question Lt. Shirlaw's directives or tell her they were "bullshit."  In contrast, the same directive from Maj. Garvey would be accepted without question.

18

93.     Some male Court Officers complained that the way in which Lt. Shirlaw managed the annual leave calendar was unfair.  In May 2015, Lt. Shirlaw prepared the schedule as usual, but had a male Sergeant announce that he had prepared it.  Many male Officers told the Sergeant they were relieved that the leave schedule was finally done fairly.

94.     In early 2016, a male Court Officer came to work intoxicated.  When Lt. Shirlaw confronted him, he called her a "faggot" and a "pussy."  Lt. Shirlaw took his shield and reported the incident to Chief Magliano and Chief Clerk Barry.  The next day, Chief Magliano returned the officer's shield and reassigned him to duty, thus undercutting Lt. Shirlaw's authority and placing her in a hostile environment.

**OCA and Officer Quirk Give False Reasons to Justify Maj. Allen's Promotion to Major**

95.     On March 4, 2016, Lt. Shirlaw raised with Chief Clerk Barry and Chief Magliano her concern that Maj. Allen and Maj. Arcati had received preferential treatment – promotions to Major – because they were men.  In response, they told Lt. Shirlaw that she had not received either promotion because she was considered to be "too abrasive."

96.     In 19 years as a Court Officer, no one had ever told Lt. Shirlaw that she was "abrasive" in connection with a missed promotion, as part of a performance review, or otherwise.

97.     Indeed, Lt. Shirlaw's 2015 Performance Evaluation, which she received on April 6, 2016 – two months after she interviewed for the Major position – did not mention that she was "abrasive," or otherwise critique her management style or interpersonal relations.  Similarly, there is no critique of Lt. Shirlaw's management style or interpersonal relations in her reviews from any prior or subsequent year.  To the contrary, many judges, senior Court Officers, and other court personnel have complimented Lt. Shirlaw on her management style.

98.     The characterization of Lt. Shirlaw as "abrasive" also is false.  According to her written performance reviews, Lt. Shirlaw is known as being "well respected," "professional," "an irreplaceable asset" and as having "a positive attitude," "superb" and "unparalleled" management skills, and "maximum tact," qualities that are applauded in male Court Officers.

99.     In contrast, high ranking male Officers, including several who OCA has promoted over Lt. Shirlaw, frequently lose their temper, curse, and yell.  Several have had outbursts directed at members of the public and staff.  Maj. Allen, for example, frequently raises his voice or curses, and has publicly described the female Borough Chief Clerk as a "fucking cunt."  He has threatened to hit officers who complain about his orders.  No one has ever described Maj. Allen or any other male officer as "too abrasive," or denied them a promotion because of such behavior.

100.    In their March 4 meeting, Chief Clerk Barry and Chief Magliano told Lt. Shirlaw that they would "work with [her]" to help her become less abrasive.  In more than a year since that meeting, neither individual has so much as mentioned the issue to Lt. Shirlaw, in any context.

101.    Chief Clerk Barry and Chief Magliano never identified any specific behavior of Lt. Shirlaw's as "abrasive."  Upon information and belief, Chief Clerk Barry and Chief Magliano find Lt. Shirlaw to be "abrasive" because they believe a commanding officer role should be performed by a man, rather than a gay woman.

102.    After learning she would not receive either Major promotion, Lt. Shirlaw spoke with Judge Jackson, who told Lt. Shirlaw that Officer Quirk had already spoken with her, and told her that Lt. Shirlaw had not received the promotion because she was "abrasive."

103.     Judge Jackson told Lt. Shirlaw that she did not believe she was abrasive, and that she understood how difficult it was to be a woman in a male-dominated field. She, however, took no action to remedy the plainly discriminatory circumstances.

104.     In fact, when Lt. Shirlaw explained to Judge Jackson that she believed she was being treated unfairly because she was a woman, Judge Jackson urged her not to raise the issue of discrimination. Judge Jackson warned Lt. Shirlaw that Officer Quirk was very powerful and connected to many prominent people, and that Lt. Shirlaw would be "black marked" if she pursued a complaint. Judge Jackson further warned Lt. Shirlaw that if she went against Officer Quirk and OCA, she would lose, and they would "screw" her.

**Lt. Shirlaw Files a Complaint with the Inspector General for OCA**

105.     On or about April 25, 2016, Lt. Shirlaw filed a complaint of discrimination with the Office of the Inspector General (the "IG") for OCA.

106.     Less than a month later, on or about May 23, 2016, Officer Quirk called a possible witness in the investigation, Court Officer Bernadette Dalton, to notify her that she may be contacted by the IG. In that call, Officer Quirk asked Officer Dalton questions designed to divulge how she would respond to the IG interview, suggested that Lt. Shirlaw may be the subject of a lawsuit, and suggested that Lt. Shirlaw's complaint was meritless. Officer Quirk told Officer Dalton to keep the call a secret and to call him immediately if she spoke with the IG.

107.     Officer Quirk suggested to Officer Dalton that Lt. Shirlaw may never be promoted to Major because Chief Michael Magliano and Chief Clerk Barry were "pissed" at Lt. Shirlaw for filing the IG complaint. He also told Officer Dalton that if he provided certain information to the IG, it would "bury" Lt. Shirlaw.

108.     Lt. Shirlaw's counsel brought Officer Quirk's interference to the attention of the IG's office and OCA who, upon information and belief, took no action to reprimand Officer

Quirk or prevent further interference. Officer Dalton was never contacted by the IG's office concerning Officer Quirk's conduct.

**Defendants' Unlawful Actions Continue and Warrant Injunctive and Other Relief**

109. On December 13, 2016, Lt. Shirlaw filed a charge of discrimination and retaliation with the EEOC.

110. On January 31, 2017, Deputy Chief Administrative Judge Fern Fisher mailed Officer Quirk a letter stating that the IG's office had reviewed Lt. Shirlaw's complaint "contending that [he] had referred to female judges using offensive language" and found the allegation to be unsubstantiated, and that she agreed with the conclusion. The letter made no mention of Lt. Shirlaw's claims of discrimination or Officer Quirk's discriminatory role in the promotion process.

111. Lt. Shirlaw received a similar letter from Judge Fisher, also dated January 31, 2017, stating that her complaints "contending that [she was] passed over for a promotion because [she is] a woman, in favor of men, and because of [her] sexual orientation, and that Dennis Quirk referred to female judges using offensive language," were found by the IG to be unsubstantiated, and that she had adopted that finding.

112. The following day, at a meeting attended by approximately 28 NYSCOA delegates (all Court Officers from various courts in New York City), Officer Quirk publicly announced confidential and private information concerning Lt. Shirlaw's complaint, and distributed copies of Judge Fisher's letter regarding Lt. Shirlaw's complaint to everyone in attendance. Officer Quirk mischaracterized the nature of her claims by stating that Lt. Shirlaw alleged she was entitled to the Major position because she was a gay woman, that her "federal suit" had been dismissed, and suggesting that Lt. Shirlaw's claims were meritless and had been brought in bad faith.

113.     Officer Quirk instructed Officer Irene Mattor, Lt. Shirlaw's union delegate and a Court Officer reporting to Lt. Shirlaw, to bring her a copy of Judge Fisher's letter stating that the investigation into Lt. Shirlaw's claims had been closed.  In doing so, Officer Mattor explained to Lt. Shirlaw that Officer Quirk had also mailed a copy of her confidential IG complaint to all of the delegates some time ago.  While Officer Mattor and Lt. Shirlaw were speaking, Officer Quirk called Officer Mattor to ask how Lt. Shirlaw was "taking the news."

114.     When Lt. Shirlaw saw Officer Mattor the following Monday, she asked if she could provide a copy of the IG complaint that Officer Quirk had sent her.  Officer Mattor told Lt. Shirlaw that Officer Quirk had told her she was no longer allowed to speak with her, and that he had instructed her not to give Lt. Shirlaw any assistance.

115.     To prevent further harassing conduct, Lt. Shirlaw's counsel wrote Officer Quirk a letter asking him to cease his retaliation.  The day after it was sent, Officer Mattor publicly handed Lt. Shirlaw a copy of that letter as well, and told her that Quirk "wanted [her] to have a copy."

116.     A day or two later, Officer Mattor, at Officer Quirk's direction, also delivered to Lt. Shirlaw a copy of a letter his attorney had sent to hers.  The letter stated that she had no basis to sue Officer Quirk, and that if she did, he would file counterclaims against her, and seek sanctions.

117.     Lt. Shirlaw's counsel wrote a letter to Judge Fisher concerning Officer Quirk's retaliation, asking that she intercede.  He did not receive a response and upon information and belief, neither Judge Fisher nor any other person at OCA has taken any measure to prevent further retaliation by Quirk.

118.     On March 28, 2017, NYSCOA, which was named as a Respondent in Lt.

Shirlaw's December 13, 2017 EEOC charge, filed its position statement with the EEOC.  Officer

Quirk submitted an affidavit in support of NYSCOA's response.

119.     Due to the stress caused by OCA's and Officer Quirk's swift and unlawful

retaliation, which has caused her considerable physical and emotional distress, Lt. Shirlaw

requested to be transferred from 100 Centre Street to the One Centre Street Summons Part

command.  She transferred to that command on or about March 30, 2017.

120.     Four working days after her arrival at her new command, on or about April 4,

2017 NYSCOA convened a meeting with the entire command, approximately 16 officers, but

specifically excluded Lt. Shirlaw from the meeting.  At the meeting, Court Officer Ted Cantor,

Vice President of the NYSCOA, stated that the NYSCOA had received a call "about the new

supervisor" (meaning, Lt. Shirlaw) and invited "anyone [that] has a problem with her," or

"thinks" they have a problem with her, to give the NYSCOA office a call.

121.     This statement was met by general confusion among the officers, who had never

been encouraged to lodge complaints against one particular officer or supervisor before.  In

addition, many of them had just met Lt. Shirlaw for the first time and were confused as to who

might have called the union to report an issue with her.

122.     Upon information and belief, NYSCOA never received a call about Lt. Shirlaw

from anyone at the One Centre Street command.  Upon information and belief, Officer Cantor's

request for complaints about Lt. Shirlaw was made at the behest of Officer Quirk, for the purpose

of tarnishing her reputation at her new command, and inviting complaints that OCA might use as

a basis to discipline Lt. Shirlaw or affect her ability to receive a later promotion.

123. A few days after the meeting, Lt. Shirlaw asked Officer Cantor about the nature of the complaint, why she had not been informed of or asked about the complaint, and why a meeting was held at her command to solicit complaints about her. He told her only that he did not take the complaint and did not know what it was about, but that he did not "think it was a problem." Lt. Shirlaw then attempted to contact Officer Quirk several times, but he has refused to take or return her calls.

124. A Sergeant at One Centre Street told Lt. Shirlaw that he had spoken to the officers in the command and none had made a complaint about Lt. Shirlaw.

125. NYSCOA's procedure was highly irregular. Upon information and belief, complaints frequently are swept under the rug and are not addressed at all. When they are addressed, either the commanding officer or a representative from NYSCOA will speak about it directly with the officer. Public meetings to announce complaints and solicit further complaints are unprecedented.

126. Lt. Shirlaw's counsel again wrote a letter to Judge Fern Fisher asking her to intercede to prevent further retaliation against Lt. Shirlaw. Upon information and belief, OCA has taken no action to discipline Officer Quirk or to prevent further retaliation against Lt. Shirlaw.

127. Lt. Shirlaw is entitled to damages and injunctive relief as a result of Defendants' unlawful discrimination and retaliation.

128. Defendants' actions were unlawful and in violation of Plaintiffs' rights under Title VII and the NYCHRL, and had no legitimate business rationale.

129. Defendants' actions have harmed Lt. Shirlaw's prospects for future promotions within OCA.

130.     Lt. Shirlaw has suffered and continues to suffer damages, including the loss of past and future earnings, and other employment benefits.  Lt. Shirlaw also has suffered and continues to suffer from severe emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

131.     Defendants' individual and aggregate acts of retaliation have affected or threatened to affect the participation of witnesses and/or Lt. Shirlaw in this matter.

132.     Lt. Shirlaw does not have complete, plain, clear or adequate remedy at law.

133.     Defendants must be restrained from further retaliation and discrimination against Lt. Shirlaw and directed to cease and desist from their unlawful acts against her which, by continuing, constitute on-going and imminent injury.

134.     Lt. Shirlaw believes that the Defendants' unlawful acts against her will continue until this Court, by injunction and/or judgement, compels them otherwise.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Discrimination Because of Gender by Defendant OCA under Title VII)**

135.     Lt. Shirlaw incorporates by reference the allegations in paragraphs 1-134 of the Complaint as if fully restated herein.

136.     Title VII prohibits any employer from discriminating against an employee in the terms and conditions of her employment on the basis of gender or the employee's conformity with gender stereotypes.

137.     OCA violated Title VII when it intentionally discriminated against Lt. Shirlaw in the terms and conditions of her employment because of her gender and/or her conformity with gender stereotypes.

138.     OCA acted with willful and/or reckless disregard for Lt. Shirlaw's statutorily

protected rights

139.     As a direct result of OCA's discriminatory acts, Lt. Shirlaw is entitled to damages

including, but not limited to past and future lost wages and benefits, damages to compensate her

for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees

and costs of this action, and pre-judgment interest.

## SECOND CLAIM FOR RELIEF
### (Retaliation by Defendant OCA under Title VII)

140.     Lt. Shirlaw incorporates by reference the allegations in paragraphs 1-139 of the

Complaint as if fully restated herein.

141.     Title VII prohibits an employer from retaliating against an employee in the terms

and conditions of her employment for exercising her rights under the statute.

142.     OCA illegally retaliated against Lt. Shirlaw for exercising her rights under the

statute.

143.     OCA acted with willful and/or reckless disregard for Lt. Shirlaw's statutorily

protected rights

144.     As a direct result of OCA's retaliatory acts, Lt. Shirlaw is entitled to damages

including, but not limited to past and future lost wages and benefits, damages to compensate her

for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees

and costs of this action, and pre-judgment interest.

## THIRD CLAIM FOR RELIEF
### (Discrimination Because of Gender and Sexual Orientation
### by Defendant Quirk under NYCHRL)

145.     Lt. Shirlaw incorporates by reference the allegations in paragraphs 1-144 of the

Complaint as if fully restated herein.

146.     The NYCHRL prohibits any employer from discriminating against an employee in the terms and conditions of her employment on the basis of gender or sexual orientation.

147.     Officer Quirk violated the NYCHRL when he intentionally discriminated against Lt. Shirlaw in the terms and conditions of her employment because of her gender and or sexual orientation.

148.     OCA acted with willful and/or reckless disregard for Lt. Shirlaw's statutorily protected rights

149.     As a direct result of OCA's discriminatory acts, Lt. Shirlaw is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## FOURTH CLAIM FOR RELIEF
### (Retaliation by Defendant Quirk under NYCHRL)

150.     Lt. Shirlaw incorporates by reference the allegations in paragraphs 1-149 of the Complaint as if fully restated herein.

151.     The NYCHRL prohibits any employer from retaliating against any employee who has engaged in any activity protected by the NYCHRL.

152.     Officer Quirk has retaliated against Lt. Shirlaw for engaging in conduct protected by the NYCHRL, in violation of the NYCHRL.

153.     Lt. Shirlaw is entitled to damages including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.    Declaring that the acts, practices, and omissions complained of herein are unlawful and violate Title VII and the NYCHRL;

B.    Enjoining and permanently restraining Defendants from engaging in such conduct;

C.    Directing Defendants to pay Plaintiff back pay, compensatory damages, and pre-judgment interest for violations;

D.    Directing Defendants to make Plaintiff whole with respect to lost benefits and equity;

E.    Directing Defendants to award Plaintiff the position of Major or pay Plaintiff front pay in lieu of promotion;

F.    Directing Defendants to pay exemplary and punitive damages sufficient to punish and deter continuation of Defendants' discriminatory, retaliatory and unlawful employment practices;

G.    Awarding Plaintiff reasonable attorneys' fees, costs, and expenses; and

H.    Awarding such other legal and equitable relief as this Court deems necessary, just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims raised by the complaint

Dated: New York, New York
   June 14, 2017

                                    Respectfully submitted,

                                    /s/ *Gregory S. Chiarello*
                                    Gregory S. Chiarello

                                    **OUTTEN & GOLDEN LLP**
                                    Darnley D. Stewart
                                    Gregory S. Chiarello
                                    685 Third Avenue, 25th Floor
                                    New York, New York 10017
                                    Telephone: (212) 245-1000
                                    Facsimile: (646) 509-2071
                                    *Attorney for Plaintiff*